# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**JAMES ACKER,**

      **Petitioner,**

**v.**                              **Case No. 8:07-CV-263-T-30TBM**

**SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,**

      **Respondents.**

_____/

## <u>ORDER</u>

Before the Court is the Petition of James Acker (hereinafter "Petitioner" or "Acker") for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. #1), Respondents' Response (Dkt. #10) and Petitioner's Reply (Dkt. #15). After a review of the pleadings and the record, the Court determined that, while perhaps not necessary because of the speculative nature of the factual assertions in the petition, an evidentiary hearing should be held as to ground three. That hearing occurred on April 16, 2009. Based upon the pleadings, the testimony at the hearing, and argument of counsel, the Court concludes that the Petition should be denied because it fails to demonstrate that relief is merited pursuant to 28 U.S.C. § 2254(d)(1) and (2).

## BACKGROUND

Acker was found guilty in a jury trial on one count of first degree murder and one count of second degree murder. He was sentenced on September 14, 1992, to life in prison without the possibility of parole for twenty five years on each count. His appeal was *per curiam* affirmed without written decision. Acker v. State, 649 So.2d 872 (Fla. 2d DCA 1995) [table].

On February 6, 1997, Acker filed a motion for post-conviction relief alleging ineffective assistance of counsel. He faulted his lawyer's performance in choosing the theory of defense, introducing damaging testimony, failing to cross-examine potentially helpful witnesses, and giving harmful opening and closing arguments.

The post-conviction court scheduled an evidentiary hearing on these contentions. In preparation for the hearing, the state prosecutors met with Acker's trial counsel to discuss the allegations. Acker objected, claiming that all of his allegations were based on the record and it was a violation of the attorney-client privilege and his Fifth Amendment rights for his attorney to meet with the prosecutors. The post-conviction court overruled the objection. After an evidentiary hearing on the ineffectiveness claims, the post-conviction court, on August 26, 1999, denied the motion. Acker appealed. On March 9, 2001, the appellate court reversed and remanded for a new trial because of the ineffectiveness of defense counsel in the first trial. Acker v. State, 787 So.2d 77 (Fla. 2d DCA 2001).

Prior to his second trial, Acker filed a motion to disqualify the prosecutors from his first trial from prosecuting the second trial contending that they had obtained privileged information during their discussion with his defense counsel. The post-conviction court denied that motion on August 17, 2001.

A second jury trial was held in November of 2001, and Acker was again found guilty on one count of first degree murder and one count of second degree murder. Acker appealed raising three grounds, only one of which is relevant to this petition:

> Whether a prosecutor who has obtained attorney-client privileged information as a result of a 3.850 motion may subsequently function as the prosecutor retrying the same case. (Rephrased by this Court)

The appellate court *per curiam* affirmed without written decision. Acker v. State, 837 So.2d 972 (Fla. 2d DCA 20002) [table]. The mandate issued on January 13, 2003.

Acker filed another 3.850 motion, a supplemental motion, and an amended motion raising twenty nine claims:

1. Ineffective assistance of counsel for counsel's failure to investigate the procedure used by the State in obtaining a positive identification of Defendant, in order to determine if the procedure was impermissibly suggestive.

2. Ineffective assistance of counsel for counsel's failure to motion the Court to exclude Pam Deimund's identification testimony based on the grounds that it was the product of an impermissibly suggestive procedure, that the identification was unreliable, and that its probative value was outweighed by the prejudice to Defendant.

3. Ineffective assistance of counsel for counsel's failure to investigate and present evidence demonstrating that witness Pam Deimund did not get a sufficient look at the individual she saw leaving the victim's apartment the night of the murders.

4.      Ineffective assistance of counsel for counsel's failure to fully impeach Pam Deimund's identification testimony with all of her prior inconsistent statements.

5.      Ineffective assistance of counsel for counsel's failure to obtain a paternity test to determine that Defendant was not the father of witness Kelly Reynold's daughter, in order to prevent the State from impeaching Ms. Reynolds.

6.      Ineffective assistance of counsel for counsel's failure to motion the Court to exclude testimony from Deputy Royce Wilson pertaining to the identification of two latent fingerprints he recovered from the victim's apartment which belonged to Patrick Hannon.

7.      Ineffective assistance of counsel for counsel's failure to have an independent examination conducted on latent fingerprints recovered from the victim's apartment which were of comparable value but did not match either victims or any known suspect.

8.      Ineffective assistance of counsel for counsel's failure to investigate evidence obtained through law enforcement wire taps of Ron Richardson's communication prior to becoming a prosecution witness.

9.      Ineffective assistance of counsel for counsel's failure to motion the Court to exclude testimony from Ron Richardson on the grounds that his testimony was irreparably contaminated as a result of his exposure to discovery material regarding the investigation of the murders.

10.     Ineffective assistance of counsel for counsel's failure to investigate hair evidence obtained during the murder investigation which might have implicated Michael Richardson in the murder.

11.     Ineffective assistance of counsel during voir dire, including counsel's failure to:

        A.      Voice an objection to the Court dismissing prospective jurors for cause without affording Defense counsel an opportunity to examine them;

B. Voice an objection to the Court dismissing prospective jurors for cause that did not meet the statutory requirements for such challenges;

C. Conduct an effective voir dire examination and challenge prospective jurors for cause;

D. Use a peremptory challenge on prospective juror Emilio Moreno.

12. Ineffective assistance of counsel for counsel's comments during opening statement and during his cross examination of Ron Richardson which put forth evidence that, with the assistance of Ron Richardson's prior testimony, the prosecution obtained a conviction and death sentence for Patrick Hannon.

13. Ineffective assistance of counsel for counsel's failure to impeach Michael Richardson with evidence that he is a convicted felon, and failure to introduce reverse Williams' Rule evidence in the form of Michael Richardson's prior conviction in Indiana for conspiracy to commit murder.

14. Ineffective assistance of counsel for counsel's failure to conduct an adequate cross examination of Kamala Alerzma, Deputy R. Wilson, Ronda Abel, Zola Ricker, and Ron and Michael Richardson.

15. Ineffective assistance of counsel for failure to conduct an adequate direct examination of Michele Acker, and bring forth testimony that Detective Linton had threatened to have her child removed from her custody if she did not change her testimony.

16. Ineffective assistance of counsel for counsel's failure to object and ask for a mistrial on the grounds that the prosecution failed to produce a witness they claimed would testify.

17. Ineffective assistance of counsel for counsel's failure to motion the Court for a mistrial upon discovering that he would have to call Assistant State Attorneys Robert Lewis and James Hellickson to impeach Ron Richardson's denial on cross-examination that he was still

subject to prosecution and a possible death sentence for his involvement in the murders if he did not provide "truthful" testimony in Defendant's trial.

18. Ineffective assistance of counsel for counsel's failure to motion the Court for a mistrial after witnessing juror Ishamael Robinson falling asleep during direct examination and cross examination of Ron Richardson.

19. Ineffective assistance of counsel for counsel's failure to object and motion the Court for a corrective instruction and/or mistrial on the grounds that the prosecution's use of a photograph of Defendant to elicit testimony from Michael Egan that Defendant's hair style was similar to the person he saw in the parking lot of the victim's apartment complex was improper and highly prejudicial.

20. Ineffective assistance of counsel for counsel's failure to object to the prosecution's questioning of witness Royce Wilson in a manner which would elicit answers that showed Defendant to be a convicted felon.

21. Ineffective assistance of counsel for counsel's failure to call David and Jerom Thompson, Jeff Reynolds, and Debbie Rogers as defense witnesses.

22. Ineffective assistance of counsel for counsel's failure to present evidence that Pam Deimund lived in a two story townhouse, and not a one-story.

23. Ineffective assistance of counsel for counsels' failure to object to the following acts of prosecutorial misconduct:

    A. Prosecutor's questions and statements claiming that everyone knew Ms. Reynolds was a double agent.

    B. Prosecutor's improper theatrical description and use of gory photographs of victim Brandon Snider's body during opening statements before the photographs were admitted into evidence.

    C. Prosecutor's failed attempt to impeach Michele Acker's testimony that she did not make a prior statement to

Michelle Helm and the Prosecutor's misstatement of the evidence, claiming that Michele Acker did make a prior statement to Michelle Helm during closing arguments.

D.    Prosecutor's improper expression of his opinion of Defendant's alibi witness, Michele Acker.

E.    Prosecution's argument that he made a deal with a sinner, Ron Richardson, to get to the devil, Patrick Hannon and Defendant.

F.    Prosecutor's improper argument that he'll "eat" his failure to present a witness who he claimed in opening statements would testify, just like Defendant's attorney should "eat the alibi he told you he would put on."

G.    Prosecutor's presentation of misleading evidence that Pam Deimund had not had the opportunity to identify Defendant as the second person exiting the victim's apartment.

H.    Prosecutor's improper question to Ms. Kelly Reynolds as to whether she visited Defendant at the place he resides, because this question was deliberately designed to suggest to the jury that Defendant was incarcerated.

24.    Ineffective assistance of counsel for counsel's failure to motion the Court to remove the prosecution's theory of felony murder from the jury's consideration at the conclusion of the prosecution's case in chief.

25.    Ineffective assistance of counsel for counsel's failure to voice an objection to the Court's instruction to the jury that Defendant could be found guilty of first degree felony murder if the victims were killed by another person if the other person and Defendant were principals in commission of a burglary. Defendant further claims that the principle was an invited guest, so this instruction was not applicable and that its presence on the verdict form confused the jury.

26.    Ineffective assistance of counsel for counsel's failure to give a complete instruction on the underlying offense of burglary, including the definitions of "proof of intent" and/or "structure."

27.    Defense counsel rendered ineffective assistance by failing to object to the written instruction on principals which negated defendant's alibi defense.

28.    Defense counsel rendered ineffective assistance by failing to object upon discovering violation committed by the state attorneys.

29.    Defense counsel rendered ineffective assistance by failing to contemporaneously object and move for mistrial when the prosecutor improperly mislead the jury and/or committed a Giglio violation; and by failing to introduce into evidence Richardson's plea form/agreement to rebut said impropriety.

The post-conviction court entered a series of orders denying portions of these motions and a final order was issued on November 23, 2005, denying relief as to all claims. Acker appealed and, on September 13, 2006, the appellate court *per curiam* affirmed without written decision. Acker v. State, 940 So.2d 430 (Fla. 2d DCA 2006) [table]. The mandate was issued on November 7, 2006.

Acker timely filed this federal habeas petition on February 9, 2007, raising the following three grounds:

**Ground One:**    Acker was deprived of federal constitutional rights to due process, to remain silent, and to the effective assistance of counsel by the abrogation of Acker's attorney-client privilege under Florida's rule that defendants raising claims of ineffective assistance of counsel thereby permanently waive their Fifth Amendment right to remain silent and attorney-client privilege.

**Ground Two:**    Acker was deprived of his federal constitutional right to the effective assistance of counsel because his trial attorney failed to preserve the meritorious appellate issue of the trial court summarily striking seven members of the jury panel without allowing the defense an opportunity to question them.

**Ground Three:**   Acker was deprived of his federal constitutional rights to due process and the effective assistance of counsel because an impermissibly suggestive procedure was used to obtain a photographic identification of Acker by the State's key witness using a single photograph and; (a) Acker's counsel failed to adequately investigate the procedure used to obtain that identification evidence; and (b) Acker's counsel failed to move to exclude or to object to the introduction of evidence regarding the identification that was obtained using an impermissibly suggestive procedure.

## STANDARD OF REVIEW

### A.    AEDPA

Since Petitioner's conviction was entered after the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), his petition is subject to the provisions thereof. When a federal court is asked to review a criminal conviction from state court, 28 U.S.C. § 2254 places a heavy burden upon the petitioner. Habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim resulted in a decision that:

(1)    was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or

(2)    was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362 (2000).

### B.    Ineffective Assistance of Counsel

Where a claim of ineffective assistance of counsel is made, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the

defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Deficient performance is performance which is objectively unreasonable under the prevailing professional forms.  Id. at 688.  Prejudice results when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694. The Eleventh Circuit has held that "[w]hen applying Strickland, we are free to dispose of ineffectiveness claims on either of its two grounds."  Oats v. Singletary, 141 F.3d 1018, 1023 (11th Cir. 1998).  "To state the obvious:  trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable.  But the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'"  Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting Burger v. Kemp, 483 U.S. 776 (1987)).

Under Strickland, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)).

> The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992).

## **DISCUSSION**

**Ground One:**     Acker was deprived of federal constitutional rights to due process, to remain silent, and to the effective assistance of counsel by the abrogation of Acker's attorney-client privilege under Florida's rule that defendants raising claims of ineffective assistance of counsel thereby permanently waive their Fifth Amendment right to remain silent and attorney-client privilege.

The Court notes at the outset that counsel for Petitioner has artfully worded this ground to assume that some confidential information, irrelevant to the ineffective assistance of counsel claims asserted by Acker but highly prejudicial to him at trial, was imparted by his first trial counsel to the state prosecutors. But no such information is identified.

In support of ground one, Petitioner argues:

Under Florida law, for a defendant to seek relief for a violation of the Sixth Amendment right to effective assistance of counsel, he must agree to permanently waive both his Fifth Amendment right to remain silent and his attorney-client privilege as to the issues raised in his post-conviction motion. In this case, the application of this rule meant that the same prosecutors who were privy to Acker's attorney-client privileged communications due to Acker's ineffective assistance of counsel claim as to his first trial were then permitted to prosecute Acker when he was granted a second trial due to his counsel's ineffectiveness at his first trial. He was thus required to surrender his Fifth Amendment right to remain silent and his attorney-client privilege in order to seek relief for the violation of his Sixth Amendment right to counsel. . . . This result is contrary to and involves an unreasonable application of clearly established federal law as set forth by the United States Supreme Court, which has held that it is "intolerable that one constitutional right should have to be surrendered to assert another." Simmons v. United States, 390 U.S. 377, 394 (1968).[1]

_____

[1] Dkt. #1, Acker's Petition, pp. 6, 7.

Both parties cite to <u>Johnson v. Alabama</u>, 256 F.3d 1166 (11th Cir. 2001) as a correct

enunciation of the federal law on this issue. From <u>Johnson</u>, Petitioner states:

> As the Eleventh Circuit explained, "the precise boundaries of" a habeas
> petitioner's waiver of the attorney-client privilege "will vary from case to case,
> and in many instances will require careful evaluation."[2]

The cited sentence comes from page 1179 of the <u>Johnson</u> opinion, but is not the complete

sentence. The entire sentence is:

> Although the precise boundaries of the waiver will vary from case to case, and
> in many instances will require careful evaluation by the district court, there
> should be no confusion that a habeas petitioner alleging that his counsel made
> unreasonable strategic decisions waives any claim of privilege over the
> contents of communications with counsel relevant to assessing the
> reasonableness of those decisions in the circumstances.

<u>Johnson</u> at 1179.

The Eleventh Circuit in <u>Johnson</u> explains why a waiver is inherent in a claim that

one's trial counsel was ineffective:

> In formulating their strategy before trial, Johnson's lawyers were aware of
> statements by Johnson himself that he was the second man involved in the
> robbery and that he had shot at Mr. Cantrell. Johnson's now-preferred "third
> man" defense, therefore, was not compatible with the information he conveyed
> to his lawyers at the time. <u>See</u> <u>Williams v. Moore</u>, 221 F.3d 1177, 1180 (11th
> Cir. 2000) (counsel not ineffective in choosing particular defense strategy in
> capital case where reasonable counsel would have determined that petitioner's
> alternative theory "was inconsistent with Petitioner's own description of the
> killing").
>
> Notably, Johnson does not, and cannot, argue that these communications with
> his trial counsel are protected in this context by the attorney-client privilege.
> As we have explained, a party "waives its attorney-client privilege when it

---

[2] Dkt. #15, Acker's Reply, p. 4.

injects into this litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct. <u>GAB Bus. Servs., Inc. v. Syndicate 627</u>, 809 F.2d 755, 762 (11th Cir. 1987). By alleging that his attorneys provided ineffective assistance of counsel in their choice of a defense strategy, Johnson put at issue-and thereby waived-any privilege that might apply to the contents of his conversations with those attorneys to the extent those conversations bore on his attorney's strategic choices. (Footnote omitted).

<u>Johnson</u>, 256 F.3d at 1178. Further, the <u>Johnson</u> court points to the reasoning of the Fifth Circuit in <u>Laughner v. United States</u>, 373 F.2d 326 (5th Cir. 1967) which rejected a similar argument:

Having demanded and obtained a factual judicial inquiry into his claim that the attorney appointed to render him the assistance of counsel for his defense failed to discharge his responsibilities properly, appellant now proposes to invoke the privilege accorded confidential communications between an attorney and his client to eliminate the one source of evidence likely to contradict his allegations. We are unable to subscribe to this proposition. The privilege is not an inviolable seal upon the attorney's lips. It may be waived by the client; and where, as here, the client alleges a breach of duty to him by the attorney, we have not the slightest scruple about deciding that he thereby waives the privilege as to all communications relevant to that issue.

<u>Laughner</u>, 373 F.3d at 327.

The most that Acker can argue is that his rights might be violated if the state were allowed to inquire into matters that were not relevant to the issues he raised in his ineffectiveness claims. Acker attempts to limit the inquiry in this regard by contending all of his claims could be determined from the state court trial record making it unnecessary to ask his counsel why he made the choices he did. But having invoked a factual judicial inquiry into his ineffectiveness claims, he cannot prevent the state from inquiring of the "one source of evidence likely to contradict his allegations."

Acker claimed that his trial counsel was ineffective in choosing the theory of defense, by introducing damaging testimony, failing to cross-examine potentially helpful witnesses, and giving harmful opening and closing arguments. Each of these areas necessitates an explanation from defense counsel as to why he performed the way he did. Without this information, the state courts would be unable to appropriately apply the Strickland standard.

Petitioner is unable to point to any information gleaned by the prosecutors that were used to his detriment at the second trial. Without that, he is unable to demonstrate that the prosecutors went beyond the boundaries of the relevant issues in discussing his ineffectiveness claims with his defense counsel. The state courts properly applied federal law in resolving this issue. Therefore, ground one will be denied.

**Ground Two:** Acker was deprived of his federal constitutional right to the effective assistance of counsel because his trial attorney failed to preserve the meritorious appellate issue of the trial court summarily striking seven members of the jury panel without allowing the defense an opportunity to question them.

In Acker's second trial, the trial judge questioned the jurors during voir dire and summarily excused seven prospective jurors who expressed doubts concerning their ability to serve. The trial court did not allow either side the opportunity to question those prospective jurors and perhaps rehabilitate them. Neither side objected to this procedure nor requested an opportunity to question the jurors.

Acker claims his trial counsel was ineffective by failing to object to these prospective jurors being stricken without allowing defense counsel an opportunity to question them. Acker contends he was prejudiced because, had counsel objected, the issue would have been

preserved for appeal, and the appellate court would have reversed and remanded for a new trial. Acker raised this claim in his post-conviction motion and it was denied by the post-conviction court. The state appellate court affirmed without written opinion.

In his initial Petition before this Court, Acker argued only state law which he contends would have provided him an automatic reversal on appeal had an objection been made. He stated:

> Under Florida law, the summary dismissal of these seven jurors without allowing the defense an opportunity to question them would have required reversal if it had been preserved as an appellate issue. Florida Rule of Criminal Procedure 3.300(b) provides:
>
> > **(b) Examination.** The court may then examine each prospective juror individually or may examine the prospective jurors collectively. *Counsel for both the state and the defendant shall have the right to examine jurors orally on their voir dire.* The order in which the parties may examine each juror shall be determined by the court. *The right of the parties to conduct an examination of each juror orally shall be preserved.*
>
> (Emphasis added). Florida law is clear, and was clear at the time of trial, that when a prospective juror expresses doubts about his or her ability to be impartial and/or follow the law, the court *must* allow the defense to question the prospective juror before excusing him or her. See, e.g., Sanders v. State, 707 So.2d 664, 668 (Fla. 1998): Willacy v. State, 640 So.2d 1079, 1081-82 (Fla. 1994); O'Connell v. State, 480 So.2d 1284, 1286-87 (Fla. 1986); Melendez v. State, 700 So.2d 791, 792-93 (Fla. 4th DCA 1997); Green v. State, 575 So.2d 796, 797 (Fla. 4th DCA 1991).[3]

In its Response, the state addressed Petitioner's state law arguments concerning the prospects for reversal on appeal and the underlying factual basis supporting the trial court's

---

[3] Dkt. #1, Acker's Petition, p. 13.

dismissal of each of the seven jurors for cause.  Then for the first time,[4] Acker argued in his

Reply that the state court's denial of this claim was contrary to clearly established federal

law.  Acker stated:

> The denial of Acker's claim for ineffective assistance of counsel for failing to preseve the jury selection issue was contrary to and an unreasonable application of clearly established federal law as set forth by the United State Supreme Court in <u>Strickland</u>.  The Eleventh Circuit held the failure to preserve a jury selection error was ineffective assistance of counsel in <u>Davis v. Secretary for Dep't of Corr.</u>, 341 F.3d 1310, 1314-17 (11th Cir. 2003).  In <u>Davis</u>, as here, the defendant had a meritorious jury selection issue his attorney failed to preserve.  <u>Id.</u> at 1312.  The Eleventh Circuit held that "there is no question that [defendant]'s counsel performed deficiently in failing" to preserve the issue.  <u>Id.</u> at 1314.  The <u>Davis</u> court also held this failure prejudiced the defendant in that case because "there is a reasonable probability that the Florida courts would have found" the jury selection error warranted "automatic reversal," <u>id.</u>, just as the error here would have.[5]

First, Petitioner cites case law for the wrong proposition.  A defendant claiming

ineffective assistance of trial counsel must demonstrate prejudice at trial, not on appeal.

<u>Carratelli v. State</u>, 961 So.2d 312 (Fla. 2007), <u>State v. Bouchard</u>, 922 So.2d 424 (Fla. 2d

DCA 2006).  Acker cites to neither <u>Carratelli</u> nor <u>Bouchard</u>.

Second, in addressing the main issue of whether the state courts rulings were contrary

to established federal law, Acker cites only to <u>Davis v. Secretary for Dep't of Corr.</u>, 341 F.3d

1310 (11th Cir. 2003) and not to the cases distinguishing <u>Davis</u>.  <u>See, Brower v. Secretary for</u>

---

[4] The Court will assume this was not intentional gamesmanship on the part of Petitioner's counsel.  By not raising his arguments concerning federal law on the issue until his Reply, the state was unable to respond to his federal case citations.  In particular, the state was prevented from discussing the cases that distinguished Petitioner's primary supporting case, <u>Davis v. Secretary for Dep't of Corr.</u>, 341 F.3d 1310 (11th Cir. 2003).

[5] Dkt. #15, Acker's Reply, p. 8.

Dep't of Corr., 137 Fed. Appx. 260 (11ᵗʰ Cir. 2005) and Purvis v. Crosby, 451 F.3d 734 (11ᵗʰ Cir. 2006), cert. denied, Purvis v. McDonough, 549 U.S. 1035 (2006).

In Davis, a state prisoner filed a federal petition for writ of habeas corpus asserting his trial counsel was ineffective in failing to preserve a Batson[6] claim for review on appeal. Under the unique circumstances of Davis, the Eleventh Circuit distinguished Jackson v. Herring, 42 F.3d 1350 (11ᵗʰ Cir. 1995) (requiring a petitioner to show some likelihood of a more favorable result at trial had trial counsel raised the Batson claim) and ruled that trial counsel is acting in an appellate role when failing to preserve a Batson claim and therefore the prejudice required is to the appeal, not the trial. In reaching this decision, the Eleventh Circuit relied, in part, on the Florida Supreme Court's decision in Joyner v. State, 618 So.2d 174 (Fla. 1993) (failing to renew a Batson challenge before accepting a jury is deficient performance).

The Florida Supreme Court had the benefit of the Davis opinion when it decided Carratelli. In Carratelli, a defendant had filed a motion for post-conviction relief alleging that trial counsel was ineffective in failing to preserve an objection to the denial of defendant's for-cause challenges to prospective jurors. It discussed what prejudice a defendant must show in order to prevail on an ineffective assistance of counsel claim under Strickland. It said:

We believe that Davis misreads our opinion in Joyner.

---

[6] Batson v. Kentucky, 476 U.S. 79 (1986) (Equal Protection Clause prohibits a party from striking a potential juror solely on basis of race).

. . .

Therefore, contrary to Carratelli's argument, the requirements we imposed in
Joyner address the trial itself. We reject the proposition that trial counsel
renewing an objection (or failing to do so) before a jury is impaneled is acting
as appellate counsel.

. . .

In establishing the standard for postconviction relief, the Supreme Court stated
that in determining prejudice, the "ultimate focus of inquiry must be on the
fundamental fairness of the proceeding *whose result is being challenged*."
Strickland, 466 U.S. at 696, 104 S.Ct. 2052 (emphasis added). In this case, the
proceeding "whose result is being challenged" is the trial. Counsel's failure
to renew the objection-the subject of the ineffective assistance of counsel
claim-occurred at the trial. The result at trial-a conviction-is what Carratelli
challenges; and had counsel renewed the objection, the trial court might very
well have reconsidered the prior denial and granted the cause challenge.
Moreover, the prejudice-a juror to whom Carratelli objects-occurs at trial.

. . .

Accordingly, we hold that a defendant alleging that counsel was ineffective for
failing to object or preserve a claim of reversible error in jury selection must
demonstrate prejudice at the trial, not on appeal.

Carratelli, 961 So.2d at 321-323.

Since Davis, the Eleventh Circuit has had additional opportunities to address the issue

of whether an alleged ineffective assistance of trial counsel claim must prove prejudice at the

trial stage or on appeal. In Brower, a federal habeas petitioner argued that he was denied

effective assistance of counsel when his attorney did not preserve a Coney[7] claim for appeal.

Brower contended that this failure to preserve constituted ineffective assistance of counsel

_____

[7] Coney v. State, 653 So.2d 1009 (Fla. 1995) (in Florida, a criminal defendant must be present at the
bench during the exercise of preemptory challenges or must expressly waive that right).

and that the Eleventh Circuit should apply <u>Davis</u> in analyzing the prejudice prong of the

<u>Strickland</u> analysis.  The Eleventh Circuit disagreed and said:

> We agree with the district court that <u>Davis</u> is not applicable here.  In this case, Brower's counsel did not raise the issue until after Brower was convicted, thus denying the trial court the opportunity to remedy the error.  Additionally, Brower argued below that the outcome of the trial might have been different had he been allowed to participate in the jury selection.  Therefore, this is not a deficiency that only affected Brower's rights on appeal.  For that reason, we do not look to the effect of the error on Brower's appeal but, rather, its effect on the trial's outcome.  Brower has not shown that the error had an effect on the trial's outcome, let alone a reasonable likelihood that the outcome would have been different.  Therefore, we reject this claim.

<u>Brower</u>, 137 Fed. Appx. at 265.

In <u>Purvis</u>, a federal habeas petitioner alleged that his trial counsel was ineffective by

failing to object to the closure of the courtroom during the testimony of a young victim.  He

argued that an objection by counsel would have properly preserved the issue allowing him

to obtain a reversal of his conviction on appeal because his right to a public trial was

violated.  The Eleventh Circuit rejected this argument and, acknowledging that <u>Davis</u>

constituted a "razor thin exception," (451 F.3d at 740) explained:

> To establish prejudice based on a trial counsel's error: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. at 2068.  When we are considering defective performance at the guilt stage, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id</u>. at 695, 104 S.Ct. at 2068-69.
>
> Purvis cannot show that an objection from his counsel would have caused the factfinder to have a reasonable doubt about his guilt.  If counsel had objected

in a timely fashion and had persuaded the trial judge not to partially close the courtroom, there is no reason to believe that would have changed the victim's testimony in a way which would have created a reasonable doubt in the jury's mind. The victim could just as well have been a more sympathetic or credible witness if forced to testify publicly. We do not know, and when we do not know the party with the burden loses, and here that party is Purvis. See Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

Purvis, 451 F.3d at 738-739.

Contrary to Acker's contention, the state courts properly applied federal law in resolving his ineffective assistance of counsel claim. Acker has not shown, nor has he attempted to show, that he was prejudiced in the outcome of the trial by his trial counsel's failure to object to the judge's dismissal of the seven prospective jurors for cause without allowing his counsel the opportunity to question them. Had counsel questioned the seven jurors, we do not know that any of them would have survived cause or preemptory challenges to actually serve on the jury, much less whether the outcome of the trial would have been different. It is Acker's burden to show the outcome of the trial would have been different and he has not carried that burden. Therefore, ground two will be denied.

**Ground Three:**     Acker was deprived of his federal constitutional rights to due process and the effective assistance of counsel because an impermissibly suggestive procedure was used to obtain a photographic identification of Acker by the State's key witness using a single photograph and; (a) Acker's counsel failed to adequately investigate the procedure used to obtain that identification evidence; and (b) Acker's counsel failed to move to exclude or to object to the introduction of evidence regarding the identification that was obtained using an impermissibly suggestive procedure.

The state post-conviction court in denying this claim did not base its ruling on findings of fact, but as a matter of law. On appeal, the denial was *per curiam* affirmed

without written opinion by the state appellate court.  Acker v. State, 947 So.2d 430 (Fla. 2d DCA 2006) [table].  The issue before this Court, then, is whether those decisions were "contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d)(1).

The relevant post-conviction claims presented to the state courts were:

1. Ineffective assistance of counsel for counsel's failure to investigate the procedure used by the State in obtaining a positive identification of defendant, in order to determine if the procedure was impermissibly suggestive.

2. Ineffective assistance of counsel for counsel's failure to motion the court to exclude Pam Deimund's identification testimony based on the grounds that it was the product of an impermissibly suggestive procedure, that the identification was unreliable, and that its probative value was outweighed by the prejudice to defendant.[8]

The state post-conviction court denied these claims because they were vague and conclusory.  Acker did not assert that the procedure used was actually impermissibly suggestive, only that counsel should have investigated the procedure to determine if it was impermissibly suggestive and then file a motion to exclude the identification testimony.  Conclusory allegations need not be accepted as true and will not support a post-conviction claim.  David v. United States, 134 F.3d 470 (1st Cir. 1998) citing Machibroda v. United States, 368 U.S. 487 (1962).  Therefore, the state post-conviction court did not unreasonably apply federal law.  Neither did the state appellate court in affirming the denial.

---

[8] Dkt. #12, Order Denying Motion for Post-conviction relief and Supplemental Motion for Post-conviction Relief, dated March 23, 2005, record exhibit 6.

By the time Acker's claim reached this Court, it was buttressed with the factual assertion that, before trial, the witness was shown a single photograph of James Acker to make her identification. And, in his petition, Acker argues the federal law that rejects single photograph identifications as being unduly suggestive (but confuses pre-trial identifications with in-court identifications):

> It is likewise well-established that single-photograph identifications, like Deimund's in-court identification of Acker's photograph, are "impermissibly suggestive." Marsden, 847 F.2d at 1545; Cueto, 611 F.2d at 1064.[9]

Upon the assumption that "an impermissibly suggestive procedure was used to obtain a photographic identification of Acker by the state's key witness using a single photograph,"[10] Acker criticizes his trial counsel for:

1. failing to adequately investigate the procedure used to obtain that identification evidence, and

2. failing to move to exclude the identification that was obtained using an impermissibly suggestive procedure.

In an abundance of caution, an evidentiary hearing was held concerning the identification procedure actually used. Several witnesses testified. Testimony revealed the manner in which Acker's photograph was first identified.

The witness, Pam Diemund, was, at the time of the murders, a college student living in an apartment, the bedroom window of which looked directly towards the door of the

---

[9] Dkt. #1, Acker's Petition, p.19. Marsden v. Moore, 847 F.2d 1536 (11th Cir. 1988), cert. denied, 488 U.S. 983 (1988). United States v. Cueto, 611 F.2d 1056 (5th Cir. 1980).

[10] Acker's wording of ground three herein.

apartment in which the victims were murdered.  On the night in question, she heard loud crashing noises and a series of pops, looked out the window, and saw two people come out of the door of the victims' apartment.  The person in front was bent over holding his stomach and the other was walking behind him.

Ms. Diemund told police that night that she got a good look at the first individual and could participate in preparing a composite drawing.  She did not get as good a look at the second person because she was mainly focused on the first.  She said when she first noticed the second person, she noticed long hair to the shoulders and heard a woman's voice and thought that the second person might be a woman, but as the two walked near the lamp post between the apartments, she could tell that the second individual was a male.  She later saw these same two individuals in the parking lot walking with a third person, but their backs were to her.

The state knew that three individuals were involved in the murders. They identified two of the three as Patrick Hannon and Ron Richardson.  These two were charged and went to trial together.  During the trial, Ron Richardson agreed to enter a plea and cooperate with the state.  He identified the third individual as James Acker, the Petitioner here.  While the police had found the fingerprints of Patrick Hannon in the blood at the apartment, they did not find fingerprints of a second individual.  There was no physical evidence linking Acker to the crime.

The two prosecuting attorneys in Acker's case were James Hellickson and Robert Lewis.  The prosecutors anticipated that the defense was going to argue that the second

individual coming out of the apartment was Ron Richardson's brother, Mike Richardson, not

James Acker. There was evidence that all four individuals had been together that night. The

prosecutors thought they would see if Pam Diemund recognized a picture of Mike

Richardson. If not, perhaps she could exclude him from being one of the individuals that she

saw come out of the apartment where the murders had taken place.

Shortly before trial, prosecutor Hellickson, together with detective Scott Hopkins,

went to see Pam Diemund with five photographs, two of Patrick Hannon, and one each of

Mike Richardson, Ron Richardson, and James Acker. Prosecutor Hellickson described what

happened:

> Q. And let me show you what's in evidence as Exhibit 7, 8, 9, 10, 11, and
> 12 (handing them to the witness) and ask you if you remember or
> recognize those.
>
> A. Yes, I do.
>
> Q. Did you – when the meeting that was set up, according to Exhibit
> Number 7, did you attend that meeting?
>
> A. Yes, I did.
>
> Q. And what was the purpose of that meeting?
>
> A. The whole purpose of the meeting to go over and see her in person was
> to have her eventually look at a photograph of Mike Richardson to see
> whether or not he was, in fact, what we would call "a second guy out
> of the apartment," the person behind Patrick Hannon rather than James
> Acker. So, we wanted her to look at a photograph of Mike Richardson
> and either say he was or was not the second person.
>
> Q. In order to effectuate that goal, what did you do?

A.   I got the photographs together. They're depicted as Government's Exhibits 8, 9, 10, 11, and 12. And when I first got them together, I wasn't even sure about taking Government's Exhibit 12 over there, which is a photograph of James Acker. Our objective was just to have her take a look at photographs, including the photograph of Mike Richardson, which is Exhibit Number 10, to eliminate him, if she could, of being the second guy. Then just before I headed over there, I thought I might as well go ahead and grab the photograph of Acker, too, and that might be of some use at some point during the course of talking to her about Mike Richardson.

Q.   Does the identification numbers on those pictures conform to the sequence that they were laid out?

A.   Yes, they do.

Q.   Was the Acker picture in plain view at the time you laid them all out?

A.   It was not.

Q.   And how was it not in plain view?

A.   What happened was I was sitting next to her – standing next to her on the right-hand side. I put the photographs of Hannon out first, which would be 8 and 9, and then a photo of Mike Richardson, 10, and then had the photograph of Ron Richardson, Number 11; and underneath that, I had the photograph of James Acker, Number 12. And I spread the photographs out with those four photographs, being two of Hannon, one of Mike Richardson, and one of Ron Richardson, with the one of Acker being covered.

Q.   Then what occurred?

A.   Pam Diemund sat down. She moved the pictures out; and as she was moving the pictures over, she took the Ron Richardson picture and moved that over, which would have displayed the James Acker picture, Number 12; and then at that point, she immediately said, "That's the second guy," pointing to James Acker.

Q.   Was she in any way prompted to pick a particular photograph?

A. She was not.

Q. Had she been shown, to your knowledge, any – any of these photographs at any time in the past?

A. She'd been shown the pictures of – the two pictures of Hannon in Hannon's trial and then, of course, in the first Acker trial. She'd not been shown the picture of Mike Richardson, Ron Richardson, or James Acker in either the Hannon trial or the first Acker trial.

Q. In fact, until sometime in 2001, did you even have possession of the Acker photograph?

A. We didn't. Once we realized that a push, I would say, for the defense would be trying to blame Mike Richardson, at that point we got ahold of the Sheriff's Office, had them give us pictures of Mike Richardson, and we already had a picture of Ron Richardson, but then pictures of Acker, too. So, we had several pictures of James Acker that we had received; and that was, I believe, maybe just a month or so prior to the trial date.

Q. Now, this occurred a couple of days before trial; is that correct?

A. A meeting with Pam Deimund, yes, sir.

Q. And as a result of the identification, did you develop any discovery for the purpose of turning it over to defense counsel?

A. Well, the discovery we had would be the photographs, which we'd already submitted to the defense photographs of Mike Richardson and James Acker. A series of photographs had already been sent to them; and on the way back from talking to Miss Deimund, I believe either I or Mr. Hopkins, who was with me, called Mr. Lewis and informed him of the fact that Pam Deimund had said that Mike Richardson was not -- was not -- definitely not the second guy and that James Acker was. So, I informed Mr. Lewis of that.

Q. Okay. Let me show you --

 May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MR. FISHKIN:

Q.      Let me show you what's been marked in evidence as Respondent's Exhibit 15 and ask you if you recognize that (handing item to the witness).

A.      Yes, I do.

Q.      What is that?

A.      This is an exhibit that I would have sent to the defense, Mr. Fraser; and I notice that my copy, too, did not have a date on it, but I believe that it was received by the court clerk either the last part of October or the first day or so of November.  I want to say November 1st of 2001.  But this list, the evidence, the photographs were submitted to Mr. Fraser.

Q.      When you say it doesn't have a date, do you mean it doesn't have the day as opposed to the month and the year?

A.      Right.  It has "October 2001."  The date is left blank.

Q.      And would your office copies often not be conformed as to the date they were sent?

A.      I would normally, when I send something out, make a copy of it.  I have no idea why this one doesn't have a date on it.

Q.      Okay.  Prior to the trial, did you have any discussions with defense counsel regarding the identification of Mr. Acker by Pam Deimund?

A.      Yes, we did.

Q.      Where and when were those?

A.      The discussion I had was on Monday morning, November 5th, the morning of the trial; and I was standing in front of the judge, and the judge wasn't on the bench at that point.  To my right was Mr. Fraser; to my left was Mr. Lewis; and the jury box was off to my left.  We were showing him a photograph, which was an enlargement of Number 12,

the picture of James Acker; and I indicated to Mr. Frazier that this, in fact, was a copy of the photograph that Pat Deimund had identified as being the second guy, that being James Acker, the preceding Thursday, November 1st, 2001.

Q.   Did you have any discussions with her about making her -- with him about making her available for depositions?

A.   We did.  Mr. Lewis had asked if he wanted -- "he" being Mr. Fraser -- had wanted to depose Pam Deimund before she testified.  He said no. I asked if he wanted to talk – just talk to Pam Deimund before we put her on the stand, and he said no.  I informed him that, although in the first trial we had called her as a second witness at the first Acker trial, we didn't plan on calling her until the middle of the second Acker trial, so there would be plenty of time, if he wanted to, to talk to her, if not depose her; and we ended up calling her 13th in the second Acker trial.

Q.   Excuse me.  Did Mr. Fraser indicate any reasons why he wasn't going to depose her?

A.   He said he already had enough to cross-examine her with based upon her prior statements or prior trial testimony.

Q.   Did he indicate -- strike that.

A.   He also said that he didn't want to let her know what questions he'd be asking on cross-examination.

Q.   And did he, in fact, cross-examine her at the second trial?

A.   Yes, he did.

Q.   Did he do an effective job?

A.    I thought it was a very effective job.[11]

---

[11] Transcript of testimony of James Hellickson, Dkt. #33, pp. 11-17.

When Hellickson and Hopkins were driving back to Tampa, they called prosecutor Lewis and explained what had happened. Lewis immediately began trying to get in touch with the defense counsel Robert Fraser to inform him of the new development. Lewis subsequently explained to Mr. Fraser what photographs had been used and how the identification occurred.

Mr. Fraser, apparently believing that the procedure used was not impermissibly suggestive, chose to rely on his cross-examination of the witness to impeach her identification. And, in fact, he did just that - he pointed out on cross that she only had seen and identified Acker's photograph ten years after the event and had acknowledged on several occasions that she did not think she could identify the second individual. He pointed out that, even though she had told the police on the night of the event that the second person had long hair to the shoulders, she had later testified at Patrick Hannon's trial that she could not recall the second person's length of hair. (See hearing exhibit 13). But the quality of Fraser's cross-examination is not an issue - it has not been raised as a ground before this Court.

Ms. Diemund comes across as a strong witness. She has a good demeanor on the stand and answers questions directly and confidently. She identified Acker's photograph without prompting and with a 90% degree of certainty. She freely admitted that, while she was unable to give the detail necessary for a composite drawing, she did see the second individual as he walked toward her into the light. She focused primarily on the first individual, but saw both individuals clearly, at a time her heightened attention was directly upon them.

The Court finds that the identification procedure used was not unduly suggestive. Acker's assumption that the identification procedure was impermissibly suggestive because the witness had been shown only one photograph is factually incorrect. This assumption served as the foundation for his criticism of defense counsel. His foundation was obviously conjecture.

Acker's claim that defense counsel should have investigated the identification procedures is without merit. The state told defense counsel how the identification came about and what photographs had been shown to the witness. There was no need for him to "investigate" the procedure used. And, it is reasonable for defense counsel to conclude that the photographs shown to the witness were not impermissibly suggestive. She was shown five photographs - all of white males in the same approximate age group. True, she had seen the two of Patrick Hannon before. But of the remaining three, she only identified the photograph of James Acker. She was unable to identify the pictures of either Mike Richardson or Ron Richardson, even though the whole purpose of the trip was to have her exclude the picture of Mike Richardson.

Counsel for Acker now argues that the photographs were unduly suggestive because the one of James Acker is the only one of an individual with long hair. The photographs are in evidence as hearing exhibits 8 through 12. The Court has viewed the photographs and finds that they are not unduly suggestive.

The United States Supreme Court, in <u>Strickland v. Washington</u>, 466 U.S. 668, at 686-687, cautioned that "(t)he benchmark for judging any claim of ineffectiveness must be

whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Applying that benchmark to this case, it cannot be said that defense counsel's performance, in concluding that the photographs used were not unduly suggestive and handling the last minute identification through cross-examination, so undermined the functioning of the adversarial process that the trial could not be relied upon as having produced a just result. Other reasonable attorneys could have reached the same conclusion. Therefore, ground three fails.

It is therefore ORDERED AND ADJUDGED that:

1.     The Petition of James Acker (Dkt. #1) is hereby **DENIED**.

2.     The Clerk is directed to enter **Judgment** in favor of Respondents and against Petitioner.

3.     The Clerk is directed to terminate any pending motions and **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida on April 28, 2009.


_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

F:\Docs\2007\07-cv-263.order.wpd